Honorable David G. Estudillo

1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8

9

NATHEN BARTON,

Case No.: **3:21-cv-05610-DGE**

10

Plaintiff

DECLARATION OF
NATHEN BARTON IN SUPPORT
OF MOTION TO RECONSIDER

v.

11

JOE DELFGAUW, XANADU

12

MARKETING INC., STARTER HOME

13

INVESTING INC, &

14

JOHN DOE 1-10

15

Defendant(s).

16

17    My name is Nathen Barton and I live at 4618 NW 11ᵗʰ Cir, Camas WA 98607.  I am over the age

18    of eighteen, and otherwise competent to be a witness in this matter.  Except as expressly set forth

19    herein, I make this declaration in my personal capacity and based on my personal knowledge.

20    1.  Exhibit A is a true and accurate copy of an email I received from Edward Winkler on

21        September 15, 2021.

22    2.  He also went by or other people involved in the litigation referred to him as Ed Winkler and

23        Edd Winkler.

24

3. People had called the 1019 phone asking for a "Jamaal Mason" prior to September 15, 2021, but I do not know Jamaal Mason, I am not Jamaal Mason, and I've never gone to any website and used the name Jamaal Mason to consent for calls.

4. Exhibit B is a true and accurate copy of a transcript of the 5/22/2022 court hearing in this case. I ordered the CD of the audio of the proceedings and I hired Susan E. Anderson to transcribe about five minutes of the audio.

5. My wife and I do not want unsolicited sales calls to us or any member of our house.

6. We do not want robocalls to any member of our house without written consent or things for the public good.

7. Despite our wishes we often receive unwanted telephone calls, and we find the calls to be obnoxious because we want to leave our ringers on for the calls we want, but unwanted ringing phones are disruptive and obnoxious.

8. Our children are supposed to have their ringers on when not in school so that my wife and I can call them and get ahold of them when we want to, but when they receive frequent unwanted calls they turn their ringers off.

9. Members of the house are sensitive to ringing phones, they are more distracted and take longer to get back on task.

10. I have years of experience investigating the identity of people and entities initiating unwanted phone calls to our house, or on whose behalf they were calling.

11. I am sure there are people far better than I, but I am probably better than many.

12. When I refer to "Callers" in the following paragraphs, I am referring to the people and entities initiating unwanted phone calls I answer, or the people or entities on whose behalf they are initiating the calls for.

DECLARATION OF NATHEN BARTON - 2 / 10
CASE NO 3:21-CV-05610-JRC

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

13. There is no one method that identifies all Callers, and I have never identified most of the people and entities who have called me without consent.

14. But the most productive method to identify Callers is to keep them on the phone, keep them talking, wait for opportunities to ask them for who they are calling for, for their website, for their physical address, for them to send me an email, for them to mail me something or any other information that will at least allow me to firmly connect this call to others.

15. Getting most telemarketers who call our house to admit who they are or who they are calling for is an art, not a science, because there is no set formula for getting information out of them, there are just experiences that help me keep this specific telemarketer talking and giving up information. That said, most calls don't result in identifying the telemarketer.

16. In my experience, while Callers want to telephone solicit as that term is defined in 47 CFR § 64.1200(f)(15), they are very warry of revealing their identities until they are confident they have found a buyer for their services and they usually wait as long as possible to reveal their true identity.

17. A few Callers are legitimate businesses like Walmart who call without consent because they are too lazy to check if a telephone number has changed hands or to remove a number from their database in response to a STOP, and these legitimate businesses will openly identify themselves, but these sorts of unwanted telephone calls are the uncommon exception.

18. By far, the most common unwanted telephone solicitations are initiated by Callers who use fake business names, unregistered business names, no business name, d/b/a names from a far-off state that are very difficult to find, websites with no true identifying information, and spoofed (fake) calling numbers.

DECLARATION OF NATHEN BARTON - 3 / 10
CASE NO 3:21-CV-05610-JRC

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

19. Voice callers nearly always use layers of call center phone agents who ask questions designed to sort out the people who are potential customers for the goods or services from those they sense are just on the line to ascertain their identity.

20. They often start a call asking to speak with a specific person, or asking the person who answers for their name.

21. Callers have called the 1019 number asking for Ivette Jimenez, James Martinez, Jamaal Mason, Patrick Nunez, Raymond Poor, and other people who I don't remember their names.

22. The Callers often will hang up immediately up if you don't confirm the name they are looking for, so not confirming the name they are looking for gives a substantial risk the investigation into who is calling will end before it begins.

23. The Callers will usually screen with questions and often you can tell if you gave a wrong answer by what they say next or their tone of voice, and that almost always results in a hang up or the flow of information shutting down, and no more evidence gathering.

24. These screeners typically hang up the call very quickly if they sense something is off about the call or they suspect the callee has an unnatural interest in their identity.

25. In my experience, over 95% of voice callers hang up on me before I ascertain their true identity despite my telling them what I believe they are looking for from a callee.

26. For this declaration I will speak of the recordings as if it is my voice on them and the calls are not edited, but in this declaration I can't testify that the calls are not edited because I no longer remember actually having any of those conversations out of the thousands of conversations with telemarketers I've had over the years.

27. In listening to the recordings, I can see the different investigative techniques at work.

28. For example, in the 11/17/2021 dated call, I answer "hello" but don't give my name.

29. I would be listening for what name they address me by, if any, or ask for if any, and what name they use to introduce themselves, and what entity name they use, if any, and what script they use to warm me up for a sales pitch, all to try and mentally connect that call with my experience with similar past callers.

30. The 11/17/2021 call is where the agent says: "looks like you just responded from a text message we sent out to you" and then goes on to ask more questions.  It is not unusual for telemarketers to start the call out pretending they are calling in response to something we've done online.

31. I would have answered the questions with what my experience at the time told me he wanted to hear, and my memories of what I had told past callers that worked to keep them on the line, or didn't work and resulted in a hang up or no information, to keep him on the line and get him willing to disclose useful information.

32. In many voice calls if you can stay on the call long enough there are opportunities to ask questions that might result in useful information tracing the call to the entities responsible and in this 11/17/2021 call I can tell that after answering a few of his questions, it felt safe to ask him some questions that might lead to the entities he was calling from or soliciting for, and eventually he says he is from what sounds like "Trust [something] Auto Insurance".

33. In this 11/17/2021 call he said: "looks like you just responded from a text message we sent out to you" and I sound genuinely puzzled when I asked him "you said responded to a text message?".  He responds "Yes", and I sound genuinely puzzled when I ask: "What text message?" and then he responds: "To help you save money on your auto insurance sir".

34. At the time I didn't connect the call with receiving a text message from the defendants because as the Court can see, Table 1 (Dkt 423 page 2) does not list a voice call on 11/17/2021.

35. It wasn't until after the defendants disclosed the recording that I connected the dots on this call to a specific text message sent shortly before the call.

36. The next image is a true and accurate copy of text message the 1019 phone received on 11/17/2021 at 8:43am with a link to http://getstartedhere.xyz, about 50 minutes prior to the voice call.



37.

38. Typing this URL http://getstartedhere.xyz into a web browser opened webpage

*TrustBuiltInsurance.com*,

39. I took the following video of this happening on or about November 28, 2021.  This video is

a true and accurate copy of the original video.



40.

41. This video is available at https://www.youtube.com/watch?v=8lT-R6S8kNA.

42. My research indicates this link to http://getstartedhere.xyz in the text message was just as it

appears, a simple link to "http://getstartedhere.xyz".

43. Text messages don't have complex links like this that don't display the true destination,

which in this case is https://simpletexting.com/blog/how-to-add-a-link-to-a-text-message/.

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

44. This means that the link http://getstartedhere.xyz was just the link "http://getstartedhere.xyz", it didn't have a hidden tracking code, so even if I clicked on http://getstartedhere.xyz from the text message, the message's sender would not know.

45. I did not make the connection between this text message and the 11/17/2021 call at the time of the call.

46. It is very unlikely I knew about the text message after it was sent but before he called.

47. Even if I did hear the phone chirp I didn't look at the unwanted text solicitations my son's phone received very often, which is why the video of seeing what webpage the http://getstartedhere.xyz link opened was created on or about November 28, 2021.

48. I am sure this is why on the 11/17/2021 recording I sounded confused and why I asked the caller "I'm not sure who you are or why your calling" and "you said responded to a text message?".

49. What I would know during the 11/17/2021 recording is that I'm in a lawsuit with the defendants and they are countersuing based on a "Ivette", so when he says: "before that, let me just confirm your information here . . . your first name is Ivette?" I would have also factored that information into my response.

50. In those 3 seconds I would have been thinking about what I know about this call and the caller so far, how that compared to other calls I had previously received, and based on those previous calls, did I think the caller would hang up if I said I wasn't Ivette.

51. I would have only said I was Ivette to keep the call going and investigate the identity of the caller.

52. At the time I almost certainly would have thought "Trust [something] Auto Insurance" sounded like a fake business name [It took me seeing Trust Built Auto Insurance in the video above before I realized he was saying Trust Built Auto Insurance in the recording]

because today I don't remember hearing this business name before, it sounds like the a fake name to me, and later in the recording he passed me to lady who identified herself as "Auto Insurance Specialist" which sounds like another fake business name.

53. It is unclear if the 11/17/2021 recording ended with the end of the call or stopped for another reason, but whatever happened I never connected this call to the defendants prior to their disclosing the recording, which shows how difficult it is to trace calls to the source.

54. Exhibit DEF003 is a true and accurate copy of a defense trial exhibit DEF003 described in Dkt. 374 page 25.

55. Outside of two depositions, I don't know Ivette.

56. I've never met her or recognized her in real life.

57. I don't know anyone who I know knows her.

58. I don't know anyone who I know has met her.

59. I don't believe we have ever worked at the same company.

60. I don't believe our children have ever attended the same school.

61. I don't believe we have ever attended the same social event.

62. Other than her witness function she is a complete stranger to me.

63. I knew nothing about her prior to the start of this litigation other than that people called the 1019 phone asking for her or if I was her.

64. I've never conversed with her about anything other than her factual knowledge relevant to litigation or arranging depositions.

65. I do have and have never had the password to *ivettealfredomartinez@gmail.com*.

66. I do not and never have controlled email account *ivettealfredomartinez@gmail.com*.

67. I have only sent email to and received emails from email account

   *ivettealfredomartinez@gmail.com* and those emails were strictly regarding her factual

   knowledge relevant to litigation or arranging depositions

68. I've never given Ivette anything of value.

69. I've never given Ivette anything of value other than offering to pay for her to stay overnight

   in the Tacoma area and pay for incidental expenses if she testified in person at trial which

   she declined.


I declare under penalty of perjury under the laws of the State of Washington that the foregoing

statements are true and correct.



_____    \_\_\_March 16, 2025\_\_\_    Signed in Camas Washington

   Signed by Nathen Barton                Date                    Clark County

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607