Honorable David G. Estudillo

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9
10
11
12
13
14

| | |
|---|---|
| NATHEN BARTON, | CASE NO. **3:21-cv-05610-DGE** |
| Plaintiff | |
| v. | RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINITFF'S CLAIMS |
| JOE DELFGAUW, XANADU | |
| MARKETING INC., & STARTER | ORAL ARGUMENT REQUESTED |
| HOME INVESTING INC, | DUE JULY 14, 2025 |
| Defendant(s). | |

15
16
17
18
19
20
21
22
23
24

Mr. Barton renews his motion for partial summary judgment filed in Dkt 423.  The remainder briefs the court on why the late disclosed recordings do not create a material fact issue and Docket 423 should be granted.  The recordings do not create a material fact issue because **1**) Mr. Delfgauw testified that he fails 47 CFR § 64.1200(c)(2)(ii); **2**) Mr. Delfgauw testifies that he now only "believes" Mr. Barton opted in, **3**) Xanadu testified in their 30(b)(6) deposition we can't know who the unknown callers are calling for; **4**) the recordings don't capture all the calls between the unknown callers and Mr. Barton – prior and concurrent calls between the unknown entities in the recordings and Mr. Barton would influence future conversations; **5**) Mr. Delfgauw admits that if the callers didn't hear the name they were looking for, the callers would hang up on Mr. Barton; **6**) Mr. Barton doesn't say anything in the calls that he wouldn't know from

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

callers themselves – i.e. the name(s) who the caller was looking for; and **7**) Mr. Barton had every

right to use deception to find out who was calling and why.

Mr. Barton's testimony in Dkt 464 [given *prior* to Mr. Delfgauw's] in ¶20 and ¶22

*matches* Mr. Delfgauw's deposition testimony *infra* –

20. They [telemarketers] often start a call asking to speak with a specific person, or asking the person who answers the phone for their name.

21. Callers have called the 1019 number asking for Ivette Jimenez, James Martinez, Jamaal Mason, Patrick Nunez, Raymond Poor, and other people who I don't remember their names.

22. The callers often will hang up immediately up if they don't hear the name they are looking for, so not confirming the name they are looking for gives a substantial risk the investigation into who is calling ending before it begins.

The defendants don't offer any evidence that Mr. Barton's purpose for engaging callers in

conversation was for anything but investigation. *Hossfeld v. Allstate Ins. Co*., 726 F. Supp. 3d

852, 869 (N.D. Ill. 2024) ("[the TCPA defendant] does not explain, for instance, what

specifically was unnecessary about Hossfeld's conduct, which, based on the call transcripts and

recordings, was consistent with Hossfeld's stated motive."),

There are new events since Dkt. 423: **8**) defendants produced no documents showing a

relationship between clicks on text message links and subsequent phone calls; **9**) Mr. Delfgauw

has presented false testimony to this Court; **10**) Mr. Delfgauw is caught in yet another fraud, **11**)

Mr. Delfgauw presented false testimony to a State court judge; **12**) there is no evidence Mr.

Barton controlled *ivettealfredomartinez@gmail.com*; and **13**) Mr. Delfgauw and Starter Home

admit to the scam they have been running on the community at large.

**1. Mr. Delfgauw testified he fails 47 CFR § 64.1200(c)(2)(ii).**

47 CFR § 64.1200(c)(2) prohibits telephone solicitation to residential phone subscribers

who registered their numbers on the national do not call list.  To evade liability, the Defendants

would have to demonstrate under 47 CFR § 64.1200(c)(2)(ii):

"It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, **written** agreement between the consumer and seller which states that the consumer agrees to be contacted by **this seller"**. Emphasis added.

See *Gulden v. Dickey's Barbeque Rests., Inc.*, 2018 U.S. Dist. LEXIS 218757, *6 ("Prior express invitation or permission, as applied to do-not-call subscribers, however, is "evidenced by a signed, written agreement between the consumer and seller... [stating] that the consumer agrees to be contacted by this seller").  In Exhibit NB502 Interrogatory #7(k) Mr. Delfgauw was asked to provide *[t]he text of the signed, written agreement required under 47 CFR § 64.1200(c)(2)(ii) if the entity under your control claims you have one.*  Mr. Delfgauw testified in response: *Don't claim we have one*, and in Exhibit NB507 Interrogatory #7(k) he testified *[d]on't have one for this case.* This is why Mr. Delfgauw stipulated in Dkt 378 ¶6:

The language the Defendants' claim Barton agreed to on educationschoolmatching.com by checking a box and clicking submit said entering in a phone number or email address on the website was only consenting to receive messages from a specific list of partners. None of the text messages Starter Home or Xanadu sent to (360) 910 1019 was from this specific list of partners.

He testified to the same under oath in RFP #8 in Exhibit NB503 pp. 8-9:

**PRODUCTION REQUEST NO. 8:**          Produce all documents showing that Nathen Barton consented in writing to receive phone calls from any entity under your control.

**RESPONSE:**

Defendant does not have Plaintiff's consent in writing.  Defendant does have Plaintiff's admissions that he clicked on all the texts to find the owner of the webpage, which is consent. Further, Defendant also has Plaintiff's voice recording consenting when he misrepresents himself as Yvette Jimenez and James Martinez.

The defendants telephone solicited a phone number on the *do-not-call* list without evidence of a signed written agreement to be contacted by *any* seller.  They fail.

**2. Mr. Delfgauw now only "believes" Mr. Barton opted in.**

Asked to give the facts of each opt-in he intended to rely on at trial, Mr. Delfgauw now only "believes" Mr. Barton is responsible (Exhibit 507 Interrogatory #4 p. 6):

> Defendant got this information from looking at the above information that their system has and matching it with the dates and messages that Barton alleges in his complaint. **Defendant's system does not save the webform or give them what webform was filled out on dates above**.

Mr. Delfgauw's "facts" are that he "believes" webforms were filled out, but he doesn't know what the webform(s) were because his system doesn't "save" them.

**3. Xanadu testified in its 30(b)(6) we can't know who the callers are calling for.**

Xanadu Marketing testified that there is no way to know who the callers were calling for, or who the callers worked for.  See its 30(b)(6) testimony Dkt 481-3 starting at 18:13:

Q.  Okay. And in the recordings, you don't know who the phone agents work for?
A.  I do not.
⋮                                              *Jump forward to 18:25*
Q.  And you don't know on whose behalf the phone agents are calling for?
A.  I do not.
⋮                                              *Jump forward to 19:6*
Q.  Okay. Do you know if the agents work for a call center that your company has hired?
A.  I do not.
⋮                                              *Jump forward to 20:8*
Q.  **Do you know if these calls themselves have any connection with your company other than that your company is just recording them?**
A.  **I do not.**
⋮                                              *Jump forward to 60:1*
Q.  But just because their [VICIdial] call center software was being used doesn't mean that the call was initiated by Xanadu?
A.  Right. There could be outside companies or entities that are also using that same software.
⋮                                              *Jump forward to 69:13*
Q.  So from the way the recordings are stored, you're not able to tell who actually initiated the call?
A.  So if you look at the last column on that exhibit, you can see an inbound or an outbound direction. Based on the file name of the recording, we can tell whether it was an incoming or an outgoing call.

Q. But you can't tell -- you said that you basically sell this software as a service. You don't know which entity initiated that call who was using your software?

A. That's correct. Recordings, the vocal recordings, don't record that or don't store that specific information.

Q. And the way the information is stored still doesn't tell you what entity was involved in making this recording?

A. That's correct.

Q. **So there's really no way to know from the information you currently have what entities were involved in making these recordings?**

A. **That's correct.**

Q. So your testimony today is that unless the recording itself -- unless someone in the recording discloses who's in the recording, we will never know who actually made the recording?

A. That's correct.

⋮                                                                                          *Jump forward to 72:17*

Q. Is this a similar issue with VICIdial?

A. Meaning that they would also not be able to tell what entity created the call unless it's stated in the recording?

Q. Yes.

A. That's correct.

Xanadu Marketing, who recorded the calls, testified that there is no way to know who the callers worked or were calling for. **We know who the callers didn't work for:**

> It is **not** stipulated and further it is disputed and denied by Defendants that phone numbers (360) 318-7867, (360)-230-6935; (360) 203-6631, (360) 203-6632, (360) 203-6633, (360) 203-6634 [all of the voice calls came from these six phone numbers] are numbers that are registered to or controlled by either Xanadu Marketing Inc or Starter Home Investments Inc. See Declaration of Joe Delfgauw. Those numbers are not owned or operated by any of the named Defendants . . . They are owned by entities that are not brought in this lawsuit and therefore are not subject to this lawsuit.  Dkt 443 4:2-9.  Emphasis in original.

**Xanadu or Starter Home disavowed the calling numbers.**

**4. What was said in other calls from the same callers?  We don't know.**

Xanadu Marketing doesn't know what other calls between these unknown callers and Mr. Barton took place before or concurrent to the call recordings.  Xanadu's 30(b)(6) deposition testimony Dkt 481-3 starting at 71:19:

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

Q.  Okay. And because we don't know what entities actually initiated these calls, we don't know
    if those entities initiated calls to this phone number not using your software?

A.  Correct.

Q.  Is there any way for us to know what other calls these entities initiated to this phone number?

A.  We're not responsible for what other entities may do that does not involve our software. So
    there's no way for us to have that information.

⋮                                                                        *Jump forward to 72:23*

Q.  And the entity that we don't know might have initiated the calls through multiple service
    providers?

A.  That is a possibility, yes.

⋮                                                                        *Jump forward to 84:16*

Q.  So lots of people can hire VICIdial, right, not just you?

A.  Correct.

Q.  And these other people might also be calling this phone number?

A.  Potentially, yes.

Q.  So if those other people called the phone number and generated recordings, are we going to
    get those recordings too?

A.  No, because we are not those other entities that may be using the system. We are only
    entitled to receive data from our -- from Xanadu's use of the system. We're not entitled to
    another company's use of the system.

Q.  **Okay. But it does have the same limitation that people were using your software as a service,
    and we don't really know who those people are now?**

A.  **Correct.**

Q.  And they could have been calling the phone number with other services, and we won't know
    those phone numbers either?

A.  Correct. There is a possibility that they could have been doing that, but we can't say that for
    sure, yes or no.

Xanadu Marketing doesn't know what other calls between these unknown callers and Mr.

Barton took place before or concurrent to the recorded calls.  Mr. Barton testified that previous

calls influence the investigation in future calls.  Dkt 464 ¶25, ¶29, and ¶31.

**5. If the callers didn't hear the name they were looking for, they hung up.**

Mr. Delfgauw testified that if the callers didn't reach the person the caller was looking

for, the caller would hang up.  Delfgauw Dep Tr. (Dkt 483-1) starting at 40:19:

Q.  So you don't know how these phone agents were trained to respond in that situation?

A.  They are trained to politely say, "I apologize for calling," if the person on the phone
    identifies themselves as someone other than the person who fills out the form.

Q.  Okay. And then hang up?

A.  Versus what? Stay on the call?

⋮                                                                        *Jump forward to 41:23*

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

Q.  So the actual answer to the question is you don't know what these phone agents were trained to do?

A.  On your specific call four years ago?

Q.  Sure. Let's start there.

A.  Okay. I know that at that time, they were trained that if somebody says -- if you call and ask for John Smith and it's Sally Jones, they are trained to not continue the call. If they hang up, I don't know. That's a little silly.

⋮                                                          *Jump forward to 44:13*

Q.  So your call center calls me, asks for Ivette. I say, "No, I'm not Ivette," and they hang up. Does --

A.  That's not what happened. So I can't speculate on what's supposed to happen.

Q.  Do you know what they're trained to do in that situation?

A.  They would be trained to hang up the phone.

⋮                                                          *Jump forward to 48:9*

A.  **. . . In all of the calls I listened to, I listened to a brief moment. The main one I listened to, they asked you if you were Ivette Jimenez, and you said yes. I don't even remember much after that.**

Q.  **Well, you agreed that if I didn't say yes, they'd hang up, correct?**

A.  **Yes, of course.**

    Delfguaw's testimony - If the callers didn't reach who the caller was looking for, the caller would hang up – matches Mr. Barton's in Dkt 464 [given *prior* to Mr. Delfgauw's] ¶22.

**6. Mr. Barton said nothing he didn't learn from the callers themselves.**

    Mr. Barton doesn't say anything in any recording indicative of the person who opted in – information only Mr. Delfgauw and the Affiliate Marketer had – such as where the opt in originated from [see Dkt. 398-1, 36:22-25], the opt in website, the opt in email address, the opt in date, or anything else Mr. Barton didn't learn from the callers themselves.  Dkt 483-1 47:9:

Q.  So for any recording that you have listened to, did I ever tell the caller anything that I wouldn't have known from previous callers?

A.  I don't have any idea about your previous callers.

Q.  So is that a "no"?

A.  That is I don't have any idea about your previous callers.

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

Xanadu 30(b)(6) Dep Tr. (Dkt 481-3) starting at 47:9[1]

Q. . . . Was there anything that I said in the recordings that I wouldn't have known from previous callers?
A. I didn't listen to the recordings, so I can't answer that question.

Mr. Barton testified *I would have answered the questions with what my experience at the time told me he wanted to hear, and my memories of what I had told past callers that worked to keep them on the line* (Dkt 464 ¶31) and that is all Mr. Barton says on any call.

**7. Mr. Barton had every right to investigate the origin of the unwanted calls**

Mr. Delfgauw testified in Exhibit 507 Interrogatory #7(g) that his method for verifying the people he calls are the people who gave consent is "Only after the individual is called and they state they never filled out a form and please take me off you call list." Mr. Delfgauw admits Mr. Barton was investigating the source of the unwanted calls. See his answer to Interrogatory #24 Exhibit 502 p. 20: *You admit that you clicked on all the text when you first received them **to further your investigation***. In that investigation:

**He can lie to uncover who they are calling for.** *Fed. Trade Comm'n v. Lifewatch Inc*., 176 F. Supp. 3d 757, 771 (N.D. Ill. 2016) (the plaintiff often misrepresented to telemarketers that the name "Lifewatch" appeared on her caller identification in order to elicit their connection to Lifewatch. "But the telemarketers' admissions are not rendered invalid just because Mey (successfully) tricked them into (truthfully) revealing that they sold products for Lifewatch.")

**He can pose as an interested consumer**. *Mey v. Pintas et al*, Case No 5:2024-cv-00055, (N.D WVA. May 17, 2024) ("the Federal Trade Commission and numerous courts have endorsed plaintiffs posing as interested consumers in order to identify the source of a call.")

---

[1] Xanadu was told that a deposition topic [Dkt 481-2, page 5 ¶28] was What information do you have about Nathen Barton's "use of Ivette Jimenez/Martinez's identity" as discussed in Dkt 462 and another deposition topic was [Dkt 481-2, page 5 ¶29] What information do you have about "steps he [Nathen Barton] took to initiate/opt-in to calls or texts under those names [Ivette Jimenez/Martinez]" as discussed in Dkt 462.

**Using a fake name wouldn't disqualify Mr. Barton as a class representative**. *Moser v. Health Ins. Innovations, Inc*., 2019 U.S. Dist. LEXIS 132790, 2019 WL 3719889 ("**the Court does not find that Plaintiff's willingness to use a name that was not his own to learn the identity of who was calling him amounts to a serious enough mark against his credibility to disqualify him as class representative**").

See also *Clough v. Revenue Frontier, LLC*, Case No. 17-cv-411-PB, (D.N.H. 2019) ("Although Clough did not owe any back federal or state taxes, he called the number from which the text was sent, provided a fake name, and feigned interest in the solicited services to identify the entity that called him . . . that he made misrepresentations when talking to NTE and other telemarketers after receiving the text message is not relevant to his contention that the defendants sent him the text message without his prior consent.""). and *Mey v. Castle Law Grp*. CIVIL ACTION NO. 5:19-CV-185, 6 (N.D.W. Va. Sep. 22, 2020) ("the Court finds that the defendants have failed to state claims for fraud. **The basis of the fraud claim, that Mey misrepresented her interest in the qualification process "in order to trap the purported telemarketers into a lawsuit" is the type of conduct encouraged by the TCPA**") and *Hossfeld v. Allstate Ins. Co*., 726 F. Supp. 3d 852, 869 (N.D. Ill. 2024) (Granting partial summary judgment to TCPA plaintiff: "Hossfeld told caller his name was Michael Johnson . . . . Hossfeld introduced self as Michael Bradley. Told caller he was interested in a quote . . . Hossfeld gave the name Michael Bradley . . . Allstate points out that Hossfeld has . . . used pseudonyms, including Michael Johnson, in the past . . . , Allstate argues in a single sentence that "Hossfeld's participation in the calls far exceeded that necessary to investigate." . . . Allstate does not further develop this argument; it does not explain, for instance, what specifically was unnecessary about Hossfeld's conduct, **which, based on the call transcripts and recordings, was consistent with Hossfeld's stated motive**.") and *Shelton v. Nat'l Gas & Elec., LLC*, CIVIL ACTION NO. 17-4063, 2019 U.S. Dist. LEXIS 59235 (E.D. Pa. April 5, 2019) ("The fact that he "play[s] along" with telemarketing scripts to "find out who [they] really are" is not as devious as Defendant suggests. A plaintiff must know the name

of the telemarketer that violated the TCP A in order to bring suit against it, and the content of the message can help prove that it was a solicitation.") and *Javitch v. Simply Solar*, 2020 U.S. Dist. LEXIS 266402, 2020 WL 13547896 ("the plaintiff met his burden by alleging that the defendant's representative called the plaintiff to confirm a fake name and address that the plaintiff had given during a robocall the day before").

**8. The Court ordered the disclosure of any reports or records "showing a relationship between clicks on text message links and subsequent phone calls". None exist.**

The defendants produced no documents in response to the Court's order because t**hey are caught in a lie**. On the one hand they believe that Mr. Barton clicking text messages helps their case. On the other hand, they claim to have no records of the text messages sent to the 1019 phone. **Don't they need records of the links they texted the 1019 phone to know if the 1019 phone clicked on them**? Records that they willfully deleted, but now Mr. Delfgauw testifies under oath that they didn't delete them because they never stored them. In Exhibit NB502 Interrogatory #1 (p. 2) Mr. Delfgauw was asked to list the text messages sent to the 1019 phone number. Referring to the texts, he answered under oath:

> Text messages- Defendant's system does not store what text was sent out. **Defendant is aware of the following text messages only from Plaintiff's Complaint and/or documents provided by Plaintiff.**

And doubled down in Exhibit NB502 Interrogatory #6 (p.7):

> Defendant does not have this information - **as noted above, - the substance of text messages are not stored by Defendant**. Upon information and belief, Plaintiff has this information as he alleges in the First Amended Complaint that he clicked on each text message to find the company that owns the webpage.

See also his answers to Exhibit NB502 Interrogatory #12/13: ***The only knowledge of the text message content is from Plaintiff's allegation in his complaint.*** This matches his answer to Exhibit 507 Interrogatory #6: *the substance of text messages are not stored by Defendant.* Asked

in Exhibit 502 Interrogatories #15/16 if the records were deleted, Mr. Delfgauw testified to both: *There were no records deleted.* If the defendants don't store what links were sent to the 1019 phone number, and they don't have records of what webpages the links the 1019 text messages were intended to open, how could they associate a link click with the 1019 phone? Of course they couldn't. Mr. Delfgauw wants to have his cake and eat it too. He wants to claim they have records of link clicking on the 1019 phone, but also claim they never kept records of what texts were sent to the 1019 phone. He testified that the only way he knows what messages were sent to the 1019 phone was by reading Mr. Barton's complaint.

They can't have it both ways. Either they saved records of what links were sent to the 1019 phone such that they knew when a URL unique to that phone was opened, or they had no way of knowing when a URL sent to the 1019 phone was opened. They tricked the Court when they said they did: *The telemarketers state that they are calling in response to Plaintiff's request for information, suggesting his consent to the call.* Dkt. 462, 11:22. There story that they didn't save records of what was sent to the 1019 phone but they know when a link sent to the 1019 phone is clicked is a fraud. They deleted their records because they were bad for them. Years ago when asked in Interrogatory #8 of Dkt 398-6 (p.7) to *Please list all the facts and evidence that [Dialer] data loss was not due to negligence of intentional acts.* Mr. Delfgauw testified "*None*".

## 9. Mr Delfgauw provided more false testimony to the Court

The defendants should have listened to Abraham Lincoln when he said *No man has a good enough memory to be a successful liar.* Donna Gibson testified in Dkt. 188 ¶7:

> On two occasions, April 1, 2021, and April 9, 2021, Defendant's software captured the IP address from which the opt-ins/consent was given . . . A true and correct copy of the spreadsheet is attached hereto as Exhibit 7.

The spreadsheet contained a number, **3824**, that impeached Mr. Delfgauw:

| campaign_id | first | last | phone | email | ip | datetime |
|---|---|---|---|---|---|---|
| 3824 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com | 71.238.123.34 | 4/1/2021 14:04 |
| 13690 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com | 71.238.123.34 | 4/9/2021 18:29 |
| 12130 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com | 8.8.8.8 | 4/13/2021 17:58 |
| 12130 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com | | 4/13/2021 17:58 |
| 12130 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com | 8.8.8.8 | 4/30/2021 15:50 |
| 12130 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com | | 4/30/2021 15:50 |

The defendants said they received a request for calls on *educationschoolmatching.com*.
Asked to produce all documents related to campaign 3824, Mr. Delfgauw said "Campaign 3824
is located at *educationschoolmatching.com*.[2]

> **PRODUCTION REQUEST NO. 16:** Produce all documents related to Campaign of 3824 as
> shown in Exhibit A above.  Please produce them in searchable PDF format.
>
> **RESPONSE:**
>   Campaign 3824 is located at educationschoolmatching.com

Because of a matching Admission the Court struck counter-allegations in Dkt. 276 p. 3:

> The Court grants plaintiff's motions as to allegations that he opted in via
> renttoownhomefinder.com. See Dkts. 257 at 2; 259 at 2. Plaintiff
> provides an admission from defendants that plaintiff only opted in from
> educationschoolmatching.com.

That wasn't the only Admission, see RFA #69 Exhibit NB149 page 10:

> **ADMISSION NO. 69:**        Admit or deny that the only "opt ins" you allege Barton to have
> committed that caused you injury occurred on the website *educationschoolmatching.com*.
>
> **ANSWER:**
>   Admitted that at this time it has been determined that Plaintiff opted into marketing
> campaigns through website educationschoolnatch.com.

---

[2] See Exhibit NB145 Production Request #16 on page 8.

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

Mr. Delfgauw now says campaign ID 3824 is *renttoownhomefinder.com*. See his answer to Interrogatory #26 ¶1 in Exhibit NB504:

> I believe on April 1, 2021 at 14:04 EST, Nathan Barton filled out the form in DKT 444-4 (Rent to Own), which prompted Mr. Barton to receive a text message from Rent to Own at 14:04 EST.

Why is Mr. Delfgauw trying to change campaign ID 3824? To avoid getting impeached by his testimony in another lawsuit. See Docket 367 pp 10-12. When Mr. Delfgauw realized his *McCrae-Coley* testimony could expose him to perjury charge, he had to abruptly change his story in this lawsuit. 3824 doesn't represent *renttoownhomefinder.com*, but he's stuck in a lie.

**10. Mr Delfgauw is caught in another fraud**

Starter Home was asked what steps Mr. Delfgauw took to cause Starter Home to stop calling/texting the 1019 number (Dkt 398-6, bottom of page 7 Interrogatory #10). Starter Home responded *Upon receiving plaintiff's lawsuit, the plaintiffs number was removed from the database*. In Interrogatory #11 (next page) Starter Home said it happened *[t]he day Defendant was served. Unsure of exact date*. Starter Home was served on **9/7/2021**, when it's President / Secretary / Director (Dkt 389-1 p. 3) was served in Dkt. 9.[3] Mr. Delfgauw's testimony in NB502 Interrogatory #18 (p.16) is almost consistent, removing the 1019 number six days later:

> **INTERROGATORY NO. 18:**
>
> List every calendar date that phone number (360) 910-1019 was removed from all calling lists or phone number databases such that no entity under your control could initiate calls or text messages to it. This request is limited in time to 3/31/2021 to 12/31/2023.
>
> **ANSWER:**
>
> **9-13-2021**
>
> **1-14-2022**

[3] Dkt 443 3,10-14: "It is also undisputed that Joe Delfgauw is the President of these entities: Xanadu Marketing Inc. and Starter Home Investing Inc. It is stipulated that Xanadu Marketing Inc and Start Home Investing Inc are entities owned by Joe Delfgauw, or rather, they are corporations of which Joe Delfgauw is the sole shareholder."

In NB502 Interrogatory #17 (p. 15), Mr. Delfgauw *List[ed] every calendar date that phone number (360) 910-1019 was added to any calling list or phone number database such that an entity under your control might initiate calls or text messages to it* with this same table he testified to in Dkt. 205-1:



| ANSWER: | | | | | | | |
|---|---|---|---|---|---|---|---|
| 449888701 | 11473 | 2022-06-12 14:06:01 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 408161203 | 12130 | 2021-12-08 12:00:39 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 408161197 | 12130 | 2021-12-08 12:00:37 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 367588486 | 12130 | 202-1-04-30 12:50:09 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 367588483 | 12130 | 2021-04-30 12:50:08 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 362407192 | 12130 | 2021-04-13 14:58:07 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 362407183 | 12130 | 2021-04-13 14:58:02 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 361284364 | 13690 | 2021-04-09 16:29:38 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |
| 358819495 | 3824 | 2021-04-01 11:04:11 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |

**Here is the $64,000 question – if the 1019 number was removed on 9/13/2021 such that no entity under Mr. Delfgauw's control could initiate calls/texts to it, and Dkt 205-1 says the next added-back-in date is 12/8/2021, how did the defendants send the 9/21/2021, 11/17/2021, and 11/23/2021 text messages to the 1019 number as they stipulated to in Dkt. 378 ¶1?[4]**

Mr. Delfgauw's first story was that only website opt-ins add phone numbers to his database.  Dkt 391 ¶3: An opt in occurs when someone fills out the required fields on a website to receive information. It can only be done by a user providing their contact information . . . ¶6 The only way information enters our system is from being entered by a user. ¶7 There is no other way that this information would be in our system. Dkt 404 ¶7 An opt-in refers to the act of a human being or a bot on a website voluntarily agreeing to participate in a service, receive communications . . . ¶10 We cannot send a text message unless a number is entered into our

---

[4] Mr. Delfgauw re-stipulated these text messages in Dkt 444 ¶5 referring to Dkt. 443 pp. 4-5. In Interrogatory #1 NB502 p. 2 he testified to a phone call to the 1019 number on 11/17/2021.

system. Dkt 444 ¶17 . . . I have safeguards in place to only use numbers that were provided through opt-ins.

In NB507 Interrogatory No #20 (p 17) he tells a new story: *[t]he only way to answer this is Mr. Barton clicked on an old text message to consent for further information*. This lie is easily debunked. Addressed *supra*, Mr. Delfgauw doesn't know what links he texted to the 1019 phone, so he has no idea when or if they are clicked, and in NB502 Interrogatory #17 (p. 15) Mr. Delfgauw testified as to the dates the 1019 phone number was added to his database.

But what could he say?  That his testimony in Dkt. 205-1, which does not show the 1019 number being added to his calling list until 12/8/2021, is fake and he's stuck?  He's not done being stuck.  In his answer to Exhibit NB502 Interrogatory, #17 (p. 15) Mr. Delfgauw testified that the last time the 1019 number was added to his company's calling lists was on 6/12/2022.

| 449888701 | 11473 | 2022-06-12 14:06:01 | Ivette | Jimenez | 3609101019 | ivettealfredomartinez@gmail.com |

Then in his answer to Exhibit NB502 Interrogatory, #18 (p. 16) he testified that the 1019 phone number was removed on 7/27/2022 and removed again on 8/15/2022. Yet in Exhibit NB502 Interrogatory, #1 (p. 2) he admits there was a text message to the 1019 phone number on 8/31/2022.  Same question, **how did the 8/31/2022 text message happen after the 1019 phone number was removed twice in the weeks prior and never added back after 6/12/2022?**

Mr. Delfgauw testified the 1019 phone number can only be getting into their system via *being entered by a user . . . There is no other way that this information would be in our system*. He left out that his "users" are affiliate marketers who get paid to inject numbers into Mr. Delfgauw's websites.

During all times relevant to this lawsuit Affiliate marketers could earn money from 'opt ins' on EducationSchoolMatching.com. Dkt 378 ¶11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

> An entity under Joeseph Deflgauw's control paid an Affiliate Marketer
> for at least one "opt in" the Defendants claim Barton is responsible for.
> Dkt 378 ¶16

He hastily fabricated Dkt. 205-1, and then stipulated to the calls and text messages without paying attention to the details. Mr. Delfgauw is in the quicksand portion of the lawsuit – the harder he struggles with the facts, the faster his story sinks.

**11. Mr. Delfgauw even presented false testimony in Washington State Superior Court**

This Court is aware of a state court proceeding between Mr. Delfgauw and Mr. Barton. Dkt. 462, 13:16. In that proceeding Mr. Delfgauw thought it to his advantage to give testimony that he was personally served that lawsuit, shown in NB498. See ¶5 "*I was personally served with the complaint in this case in the State of Florida*." Then see a video of him [hyperlink] **telling the judge he wasn't personally served, his wife was, and Mr. Delfgauw wasn't even home**. The process server agrees that Mr. Delfgauw was not personally served [Exhibit NB501] which makes Mr. Delfgauw's "*I was personally served*" false testimony. This video is from the state court hearing. Barton Dec. ¶14-17. Note the date in the video – 5/16/2025.



Four days after telling the judge to her face he wasn't personally served and he wasn't even home at the time of service, on 5/20/2025, Mr. Delfgauw refiled this declaration saying ¶5 **"I was personally served with the complaint in this case in the State of Florida."** See Exhibit 506.

Exhibits 498 and Exhibit 506 are certified copies of the original court filings.  Mr. Delfgauw lied under oath to the state court judge and he has lied under oath to this one.

**12. Mr. Delfgauw admits – no evidence Mr. Barton controlled**
***ivettealfredomartinez@gmail.com***

Mr. Delfgauw stipulated in Dkt. 378 ¶2 that the person who controlled email address *ivettealfredomartinez@gmail.com* is the person who caused the injury the alleged in their counter claim.  Ms. Martinez testified that she uses and has the password for this email address (Dkt 388-1, 6:8-20), and she never said Barton or anyone else *used and controlled the email address*.

Mr. Delfgauw has no facts Mr. Barton is that person. Interrogatory #21 Exhibit 502 p. 18:

> **INTERROGATORY NO. 21:**
>
> In ¶2 of Bates stamped document NB0006 you stipulated: "The person who used and controlled the email address ivettealfredomartinez@gmail.com is the person who caused the Defendants the injury the Defendants allege in their counter claim".  List all facts you have that Barton ever controlled email address ivettealfredomartinez@gmail.com.
>
> **ANSWER:**
>
> **Discovery is ongoing and Defendant reserves the right to supplement this answer as additional information is gathered. Upon information and belief, it appeared to Defendant that Plaintiff controlled the email by (1) making a web email with this name, or (2) accessing Ivette Martinez's email address with or without her permission. .**

**13. Mr. Delfgauw admitted to the scam**

In the same state court case, Mr. Delfgauw filed the Answer shown in Exhibit NB500 to the complaint shown in Exhibit NB499. He admitted to a number of factual allegations – CR

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

8(d) says *Averments in a pleading to which a responsive pleading is required . . . are admitted when not denied in the responsive pleading.*

| ¶ | State Complaint Allegation | D's Response |
|---|---|---|
| 56 | The Defendants and their Affiliate Marketers form a symbiotic relationship – the Affiliate Marketers use spam bots or click farms or sources of human labor to fill out the forms on these cut and paste websites and fraudulently claim other people agreed to receive phone call solicitations on behalf of the unwitting actual owners of the phone numbers. | Admitted |
| 57 | They each know their role – the Affiliate Marketer creates the fraudulent consents, Delfgauw and his companies convert the phone calls to money, and no questions asked money flows back to the Affiliate Marketer. | Admitted |
| 58 | The Affiliate Marketer is happy – he gets paid.  The Defendants are happy – they have another "customer" entered into their database! | Admitted |

### Prebutting the Response

Mr. Delfgauw has a deeply held conviction in line with his pocketbook that any investigation deception is fraud.  See Delfgauw Dep Tr. (Dkt 483-1).  While this Court may be sympathetic to that opinion, are restrictions on investigation deception in the context of investigating unwanted callers and the caller's intent in initiating them constitutional? *[T]he Constitution "demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality.  United States v. Alvarez,* 567 U.S. 709, 719 (2012).  This Court may only prohibit deceptions that are likely to cause legally cognizable harm to others or yield material and undeserved benefits to the speaker.

Harms this lawsuit addresses occurred when phone calls were unlawfully initiated for solicitation.  Once these harms existed, it is in the public's interest to identify the culprits:

> "The legislature finds that certain kinds of telephone solicitation are increasing and that these solicitations interfere with the legitimate

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

privacy rights of the citizens of the state . . . It is the intent of the legislature to clarify and establish the rights of individuals to reject unwanted telephone solicitations." RCW 80.36.390

The public's interest in rejecting unwanted telephone solicitations outweighs telemarketers' interests in remaining anonymous so they can't be hailed into court. *[T]here are circumstances in which misrepresentations, often in the form of false statements of fact by those who investigate violations of the law, are useful means for uncovering unlawful and unfair practices. In re Conduct of Gatti*, 8 P.3d 966 (Or. 2000). This is why the TCPA courts *supra* brushed off the complaints of investigative deception. Public policy rejects telemarketers evading accountability if they can sufficiently build a wall it takes deception to pierce. Screaming that investigative deception is fraud yadda yadda yadda is all Mr. Delfgauw has left, but the investigation deception could have been avoided if callers obeyed RCW 80.36.390(3).

## Conclusion

If this sham goes to a jury, they may be entertained for a few days by a telemarketer with felony fraud conviction and a farcical story full of incongruent claims and contradictions, but there isn't an actual case or controversy for them to decide.

Mr. Delfgauw has the burden of consent, and he would have to demonstrate under 47 CFR § 64.1200(c)(2)(ii) that he has written consent to solicit Mr. Barton on behalf of each Seller. But he testified in Exhibit NB507 Interrogatory #7(k) (p. 8) *Don't have one*. He can't have one because *Defendant's system does not save the webform or give them what webform was filled out on dates above*. Exhibit NB507 Interrogatory #4. If pressed to present any facts whatsoever of a consent for calls, Mr. Delfgauw has only his personal belief he got *from looking at the above information that their system has and matching it with the dates and messages that Barton alleges in his complaint*.

1    At trial, what would Mr. Delfgauw claim is the opt-in website? His multiple admissions

2    of *educationschoolmatching.com*?  Or his *McCrae-Coley* testimony and nascent change of heart

3    to *renttoownhomefinder.com*?  Perhaps he doesn't know because *Defendant's system does not*

4    *save the webform or give them what webform was filled out on dates above*.

5    Imagine the confused looks on the juror's faces when Mr. Delfgauw tells the jury by

6    clicking on links in Mr. Delfgauw's solicitations, Mr. Barton consented to more texts and calls.

7    Then he is unable to explain how he would know any link was clicked on when Mr. Delfgauw's

8    system never stored what was texted to the 1019 phone number.  Since they never stored what

9    was texted to the 1019 phone number and had no idea what was clicked, isn't Mr. Delfgauw's

10   repeated testimony about text message clicks in Dkt 404 ¶6 and ¶9, and Dkt. 444 ¶7, ¶11, and

11   ¶15 all perjury?  These declarations duped the court into ordering the disclosure of any reports or

12   records *showing a relationship between clicks on text message links and subsequent phone calls*,

13   only to come up empty.  Won't the jury feel similarly deceived?

14   And when Mr. Delfgauw testified that on 9/13/2021 the 1019 number was removed from

15   all calling lists and phone number databases such that no entity under Mr. Delfgauw's control

16   could initiate calls to it, and it wasn't re-inserted into his database until 12/8/2021, what can the

17   jury do but laugh in derision when Mr. Delfgauw admits he called it on 9/21/2021, 11/17/2021,

18   and 11/23/2021?

19   What can the jury make of the stipulation that the IP address of Google's DNS server

20   (Dkt. 378 ¶17) was used to opt in on *educationschoolmatching.com* (¶18) but then Xanadu

21   Marketing testified it's impossible. See Dkt 481-3 54:14-16:

22   Q.  Okay. Is there a way to do that from a DNS server?
     A.  There is not.

23

24

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

Mr. Delfgauw stipulated that that the person who controlled email address

*ivettealfredomartinez@gmail.com* is the person who caused the injury the alleged in their counter

claim.  Yet the only evidence any but Ivette controlled this email address is Mr. Delfgauw saying

is that *it appear[s]* to him that Mr. Barton controlled the email address.

And what can the jury think when they see his admissions in Exhibit 499 ¶¶56-58

outlining the scheme between Mr. Delfgauw and his Affiliate Marketers to use click farms and

spam bots to create these fake opt ins?

The recordings certainly don't change anything.  We don't know who the phone agents

worked for except that they didn't work for Xanadu or Starter Home, and we don't know on

whose behalf the calls were initiated.  We don't know what other conversations occurred

between Mr. Barton and the still unknown phone agents before or concurrent to the recordings.

The recordings don't tell us anything about who asked for the calls. They only show the resulting

investigation into the still unknown callers.

It is undisputed that telemarketing callers hang up unless they believe they reached the

person they are looking for.  This reasonably necessitates Mr. Barton and other TCPA plaintiffs

confirming what callers want to hear for the investigation of the entities behind the calls to move

forward.  In these recordings Mr. Barton isn't alleged to say anything he wouldn't have known

from the callers and their voices, scripts, and questions.  Ample authority supports using

deception to unmask who is calling, who they are calling for, and the purpose of the call.  Mr.

Barton testified in Dkt. 464 that he used his investigative techniques for exactly this purpose.

The jury can be entertained for a few days by a telemarketer with felony fraud conviction

and a farcical story full of incongruent claims and contradictions, or it can end now.

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

July 11, 2025



_____
(Nathen Barton)

Nathen Barton
(360) 241 7255
4618 NW 11th Cir
Camas WA 98607
FarmersBranch2014@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF System, which will automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF System, which includes the Defendant. The said Notice of Electronic Filing specifically identifies recipients of electronic notice.



_____
Nathen Barton

## LCR 7(e)(4) Certification

I hereby certify this motion contains 8,400 or fewer words.



_____          July 11, 2025
       Nathen Barton                      (Dated)