Honorable David G. Estudillo

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NATHEN BARTON, | Case No.: **3:21-cv-05610-DGE** |
| Plaintiff | PLAINTIFF'S REPLY TO DKT. 504 |
| v. | |
| JOE DELFGAUW, XANADU MARKETING INC., & STARTER HOME INVESTING INC, | |
| Defendant(s). | |

Nathen Barton replies to Dkt. 504, filed by the Defendants.

## I. MOTIONS TO STRIKE

1. Plaintiff moves to strike anything on the record concerning opt ins on *renttoownhomefinder.com / xanaduetracking.com / xanaduemarketing.outgrow.com*. See Dkt 504, 5:11-23, and Dkt. 504, 4:13-16. Defendants have admitted that the only "opt in" that they allege Plaintiff committed that caused them injury occurred on website *educationschoolmatching.com*. The Court already granted this Motion to Strike in Dkt. 276, 4:3-6.

2. Plaintiff moves to strike "Plaintiff intentionally failed to simply ask to stop the phone calls he was receiving" (Dkt. 504, 7:12), "not once has he typed "STOP" or requested the phone agent to not call him." (Dkt. 504, 9:6-7), "Instead of Plaintiff texting "STOP""

(Dkt. 504, 9:6-7), and "Barton does not enter "STOP" request when he received the text message" (Dkt. 504, 2:8-9), "does not allege asking anyone on a telephone call to stop calling, and does not allege responding to any text messages with "STOP"" (Dkt. 504, 2:15-16).  The Court ordered in Dkt. 371: *The defendants/counter plaintiffs should not be allowed to argue to the jury that Barton should have taken steps to prevent further calls.* Dkt. 371, 2:16-18.

## II.     REPLY TO DKT. 504

## Introduction

Mr. Delfgauw dropped the act in the state case.  His Answer in Dkt. 498-5 (still the live Answer as of today) admitted the following facts alleged in the Complaint of Dkt. 498-4:

| ¶ | State Complaint Allegation | D's Response |
|---|---|---|
| 56 | The Defendants and their Affiliate Marketers form a symbiotic relationship – the Affiliate Marketers use spam bots or click farms or sources of human labor to fill out the forms on these cut and paste websites and fraudulently claim other people agreed to receive phone call solicitations on behalf of the unwitting actual owners of the phone numbers. | Admitted |
| 57 | They each know their role – the Affiliate Marketer creates the fraudulent consents, Delfgauw and his companies convert the phone calls to money, and no questions asked money flows back to the Affiliate Marketer. | Admitted |
| 58 | The Affiliate Marketer is happy – he gets paid.  The Defendants are happy – they have another "customer" entered into their database! | Admitted |

Dkt. 497 pointed out the obvious: they don't have written consent required by 47 CFR § 64.1200(c)(2)(ii) and now we know why: *Defendant's system does not save the webform or give them what webform was filled out on dates above* [alleged opt in dates].  Dkt. 398-10 Interrogatory #4 p. 6.  Stipulated long ago in Dkt 378 ¶6:

> The language the Defendants' claim Barton agreed to on educationschoolmatching.com by checking a box and clicking submit said entering in a phone number or email address on the website was only consenting to receive messages from a specific list of partners. None of the text messages Starter Home or Xanadu sent to (360) 910 1019 was from this specific list of partners.

Because they need to know the website to know what the website consent disclaimer allegedly said. Then, after fooling the Court with a link-clicking story, they testified *[d]efendants have never had the text messages that Plaintiff received from them. Defendants' software does not store any sent text messages to anyone.* If they never saved the text messages sent to the 1019 phone, how would they know if one was clicked on?

Some of Mr. Delfgauw's lies came home to roost when he testified the 1019 phone number *was removed from all calling lists or phone number databases such that no entity under [Mr. Delfgauw's] control could initiate calls or text messages to it* on 9/13/2021 because they had already stipulated to calling / texting the 1019 phone number on 9/21/2021, 11/17/2021, and 11/23/2021, and also testified that they didn't re-insert the 1019 back into their calling lists / database until 12/8/2021. Recalling Mr. Delfgauw's sworn testimony, what is the only way phone numbers get into their database / calling lists?

> Dkt 391 ¶6 The only way information enters our system is from being entered by a user. ¶7 There is no other way that this information would be in our system. Dkt 404 ¶7 An opt-in refers to the act of a human being or a bot on a website voluntarily agreeing to participate in a service, receive communications . . . ¶10 We cannot send a text message unless a number is entered into our system. Dkt 444 ¶17 . . . I have safeguards in place to only use numbers that were provided through opt-ins.

If true, a user would have had to re-enter the 1019 phone number between 9/13/2021, the date they removed the 1019 number, and 9/21/2021, the date of their next call. Mr. Delfgauw doesn't allege that, and **after years of lying under oath, Mr. Delfgauw finally admits there are**

PLAINTIFF'S REPLY TO DKT 504     - 3 / 11     NATHEN BARTON
CASE 3:21-CV-05610-DGE                                                          4618 NW 11TH CIR
                                                                                                                                      CAMAS WA 98607

other ways phone numbers enter the defendants' calling lists.

**Reply to #1 – Dkt. 504 page 3**

Defendants point to out of circuit *Jones, et al. v. Blacksone*, 2025 WL2042764 (C.D. Ill. July 21, 2025), while ignoring *Ferrell v. Colourpop Cosmetics, LLC*, No. 2:25-cv-01324-SPG-AJR, 2025 U.S. Dist. LEXIS 140893 (C.D. Cal. July 22, 2025) and *Wilson v. Hard Eight Nutrition LLC*, No. 6:25-cv-00144-AA, 2025 U.S. Dist. LEXIS 122504 (D. Or. June 27, 2025).

These in-circuit opinions are well reasoned and rely on ninth circuit authority, while *Jones* does not. And contrary to their frivolous assertion, 47 C.F.R § 64.1200(c)(2) applies to all *telephone solicitation* calls. They claim Mr. Barton *made an "inquiry or application" when he "answer[ed] the questions"* on Xanaduetracking.com or xanaduemarketing.outgrow.com [Mr. Barton invites the Court to visit those websites to see for themselves the questions they ask] but like the rest of their case, unsupported by *evidence*. The FAC certainly doesn't support their assertion. Their own argument undercuts their *Johansen* claim - *when he feigned interest **and completed the enrollment process***. They disclaim knowledge of what, if anything, anyone enrolled into. See Mr. Delfgauw's testimony in Dkt. 398-10 Interrogatory #4 p. 6: *Defendant's system does not save the webform or give them what webform was filled out on dates above* [the dates of the alleged opt ins]. Dkt. 504 does not contest this testimony, and this is why they stipulated that none of the text messages they initiated to the 1019 number were with consent. Dkt. 378 ¶6. Mr. Delfgauw was asked in Dkt 498-10 Interrogatory #26 (p. 21) if there were any facts in Dkt. 378 he now contended were not true. He didn't mention ¶6.

**Reply to #2 – Dkt. 504 page 5**

Subject to a motion to strike *supra*, it is uncontested they don't know what websites/webforms were filled out because their system doesn't save them. In Mr. Delfgauw's answer to Interrogatory #4 (Dkt. 498-10 p 6) he says under oath:

It is **believed** that Barton filled out a Starter Homes Investing Inc.-Rent to Own webform on all the above dates except June 12, 2022. On June 12, 2022 he filled out Education Assistance Inc webform. **Defendant got this information from looking at the above information that their system has and matching it with the dates and messages that Barton alleges in his complaint.** Defendant's system **does not save the webform** or give them what webform was filled out on dates above.

Mr. Delfgauw admits that without seeing the text messages they sent, they didn't have a clue what website allegedly received an opt in. But how can they *look[] at the above information that their system has and matching it with the dates and messages that Barton alleges in his complaint*, know which of the **11,000** websites it came from?

> So I own almost **11,000** web sites and those web sites have opt-ins and we get somewhere between 50 and l00,000 opt-ins a day on those **11,000** sites. Dkt. 250-7, 20:16-19

**They speculate** how they got the 1019 number or if they received it from one of their **11,000 websites. They have no actual knowledge.** Remember Mr. Delfgauw's claims that phone numbers only get into his calling lists *when someone fills out the required fields on a website to receive information?*. Dkt 391 ¶3:

> *It can only be done by a user providing their contact information . . . ¶6 The only way information enters our system is from being entered by a user. ¶7 There is no other way that this information would be in our system.* Dkt 404 ¶7 *An opt-in refers to the act of a human being or a bot on a website voluntarily agreeing to participate in a service, receive communications . . . ¶10 We cannot send a text message unless a number is entered into our system.* Dkt 444 ¶17 *. . . I have safeguards in place to only use numbers that were provided through opt-ins.*

That was then. Their new story? *Maybe he clicked on a text message?*

**INTERROGATORY NO. 20:**

In ¶6 of Bates stamped document NB0110 you said: "the only way information enters our system is from being entered by a user". Bates stamped document NB0026 lines 18-20 said: "He

> 8  [Barton] filed this lawsuit against Joe Delfgauw, Starter Home and Xanadu, serving them on
> 9  September 7, 2021. Mr. Delfgauw removed the 1019 number from Starter Home's and Xanadu's
> 10 calling lists the next day.".  And Bates stamped document NB0005 stipulated that "The
> 11 Defendants" sent text messages to (360) 910-1019 on 9/21/2021, 11/17/2021, and 11/23/2021.
> 12 How did the 1019 phone number get back into Starter Home's and Xanadu's calling lists for the
> 13 calls on 9/21/2021, 11/17/2021, and 11/23/2021?
> 14 **ANSWER:**
> 15 **Once the number is put on the do not call list, it does not call the phone number, unless the person opts back in by clicking an old text or fills out the form to opt back in.  The only**
> 16 **way to answer this is Mr. Barton clicked on an old text message to consent for further information.**

If true, why don't any documents support it?  In Dkt. 486 they were ordered to *immediately produce any report or record in their possession showing a relationship between text-message opt-ins and phone calls to Plaintiff's number as it relates to the Ivette Jimenez / Martinez calls currently in dispute*.  Not a single document was produced.  Phone numbers must enter the defendants' dialer other ways, and these other ways are why Dkt 378 stipulated facts:

Dkt. 378 ¶17:  IP address 8.8.8.8 is the IP address of a Google Public DNS server.

Dkt. 378 ¶18:  The opt-ins of phone number (360) 910-1019 on educationschoolmatching.com during the times relevant to this lawsuit were from IP addresses 71.238.123.34 and 8.8.8.8 and the same entity did them both.

are incongruent with Xanadu Marketing's deposition testimony in Dkt 481-3 54:14-16:

Q.         Okay. Is there a way to do that from a DNS server?
A.         There is not.

Mr. Delfgauw lied under oath for years to protect this secret – there are other ways phone numbers enter his dialer, and he's lied so many times he finally stepped into a contradiction he can't just bounce out of with a new lie.

**Reply to #3 – Dkt. 504 page 6**

They claim "a person that filled out a webform on Defendants website and it has a TCPA disclaimer on it" but this is at odds with Mr. Delfgauw's testimony in Dkt. 398-10 Interrogatory #4 p. 6: *Defendant's system does not save the webform or give them what webform was filled out on dates above* [the dates of the alleged opt ins].  They offer no evidence or testimony that the alleged opt in website said anything at all, not the least of because as Mr. Delfgauw testified, they don't know what the opt in website (if any) is.

**Reply to #4 – Dkt. 504 page 6**

The defendants admit they have no idea *what was said by* **the same callers from other entities** *or to other individuals to Plaintiff*.  Empasis added.  They do not contest that there were other calls.  Or that what is said or learned in one call would influence what is said in another call as part of the investigation process.  Dkt 464 ¶25, ¶29, and ¶31.

**Reply to #5 – Dkt. 504 page 6**

The defendants do not contest that if the callers did not believe they reached the person they were looking for, they'd hang up.  This matches Mr. Barton's testimony in Dkt 464 [given *prior* to Mr. Delfgauw's testimony] ¶22.

**Reply to #6 – Dkt. 504 page 6**

The defendants do not contest that Mr. Barton didn't say anything in any recording indicative of the person who opted in – information only Mr. Delfgauw and the Affiliate Marketer had – such as where the opt in originated from [see Dkt. 398-1, 36:22-25], the opt in website, the opt in email address, the opt in date, or anything else Mr. Barton didn't learn from the callers themselves.

**Reply to #7 – Dkt. 504 page 7**

The defendants broadly claim that Plaintiff's investigation was consent *to the call*. Ignoring the time machine problem (Dkt. 506, 6:4-12), they don't explain, consent from *who*? They disavowed the callers as not working for Xanadu or Starter Home, Dkt. 497, 5:12-20, a fact uncontested in Dkt. 504. They argue that if Mr. Barton feigns interest during the investigation process with an entity only related to defendants via the caller using Xanadu's software and call recording services (Dkt. 497, 5:1-3), *the defendants* have consent to start calling the number too! Prior express consent doesn't work that way.

### Reply to #8 – Dkt. 504 page 7

They claim Mr. Barton *clicked on the April 1, 2021 text message*. But how would they know when immediately above this claim, they admit *Defendants have never had the text messages that Plaintiff received from them. Defendants' software does not store any sent text messages to anyone*. If they don't know what they sent to the 1019 phone, including the links, how would they know someone with the 1019 phone clicked anything. They don't address this logical absurdity because they can't, so they don't explain how they know Mr. Barton *clicked on the April 1, 2021 text message that encouraged the April 2, 2021 phone call from Defendants*. Suppose Mr. Barton clicked it on April 3? Did that encourage the *April 2, 2021 phone call from Defendants*? Where is the evidence of any click whatsoever?

### Reply to #9 – Dkt. 504 page 8

The defendants don't understand why they couldn't allege the opt in was from one website, and then suddenly change it to a different website without explanation?

### Reply to #10 – Dkt. 504 page 8

The defendants offer no explanation as to how *Defendants report shows that Plaintiff's phone number was placed do-not-call registry on September 13, 2021* yet they called it on

1  9/21/2021, 11/17/2021, and 11/23/2021.  Mr. Delfgauw's own testimony [through Starter Home]

2  was that *Upon receiving plaintiff's lawsuit, the plaintiffs number was removed from the*

3  *database*. Dkt 398-6, bottom of page 7 Interrogatory #10).  Once removed, Mr. Delfgauw

4  testified *[w]e cannot send a text message unless a number is entered into our system*. Dkt 444

5  ¶17 . . . *I have safeguards in place to only use numbers that were provided through opt-ins*.  By

6  his testimony, there must be at last one opt in between 9/13/2021 and 9/21/2021, and he deleted

7  it from Dkt. 205-1, or Dkt. 205-1 is a complete fabrication.

8  **Reply to #11 – Dkt. 504 page 8**

9  The defendants say *[w]hen the judge questioned him, Mr. Delfgauw stated that the*

10 *process server handed the documents to his wife*.  Then why, four days after telling the judge *the*

11 *process server handed the documents to his wife*, did Mr. Delfgauw again file a declaration with

12 the court saying *I was personally served with the complaint in this case in the State of Florida* in

13 Dkt 498-9?  Their own argument admits it was a false statement.



19 **Reply to #12 – Dkt. 504 page 9**

20 The defendants stipulated that the person who controlled this email address is the person

21 who caused them their alleged injury (Dkt. 378 ¶2) and they admit they have no evidence Mr.

22 Barton ever controlled the email address ivettealfredomartinez@gmail.com.

23 **Reply to #13 – Dkt. 504 page 9**

The defendants do not contest their Answer in Dkt. 498-5 admitted the following facts alleged in the Complaint of Dkt. 498-4. Nor have they moved to amend their Answer.

| ¶ | State Complaint Allegation | D's Response |
|---|---|---|
| 56 | The Defendants and their Affiliate Marketers form a symbiotic relationship – the Affiliate Marketers use spam bots or click farms or sources of human labor to fill out the forms on these cut and paste websites and fraudulently claim other people agreed to receive phone call solicitations on behalf of the unwitting actual owners of the phone numbers. | Admitted |
| 57 | They each know their role – the Affiliate Marketer creates the fraudulent consents, Delfgauw and his companies convert the phone calls to money, and no questions asked money flows back to the Affiliate Marketer. | Admitted |
| 58 | The Affiliate Marketer is happy – he gets paid. The Defendants are happy – they have another "customer" entered into their database! | Admitted |

## Conclusion

Their admitted symbiotic relationship with their Affiliate Marketers is the basis of their entire telemarketing operation. Why save the webform allegedly opted into when it is filled out by their own Affiliate Marketers? Or bother with saving the website? Why obtain the written consent required under 47 CFR § 64.1200(c)(2)(ii) when they know the phone numbers come from their own Affiliate Marketers? Or save the text messages sent based on the fake consents? This would all cost money, they know the text messages were sent based on fake consents, and the records would just be used against them in court.

If any of their opt in story was true, why did they admit the opt in was from *educationschoolmatching.com*, then cleam *renttoownhomefinder.com*? Then move to *xanadutracking.com*. Or was it *xanaduemarketing.outgrow.com* the whole time? Why did they testify one opt in was from 205.185.223.105, (Dkt 506, 7:15-21) only to change it to

1  71.238.123.34, which equals 8.8.8.8, Google's DNS server.  And what does it mean?

2  They said there was evidence of the opt ins from text message clicks.  Before changing

3  to, well, how could we know anything about clicks because we don't keep records of what we

4  text.  And they removed the 1019 number from their database such that no entity under Mr.

5  Delfgauw's control could call it.  But they still called it, proving there are other ways phone

6  numbers enter their dialer, which must be related to why several alleged opt ins are from

7  Google's DNS server IP address, something Xanadu Marketing testified was impossible.

8  No matter what happens with this motion, Mr. Barton is well equipped for this farce to go

9  to trial.

10 August 4, 2025



(Nathen Barton)

Nathen Barton
(360) 241 7255
4618 NW 11th Cir
Camas WA 98607
FarmersBranch2014@gmail.com

### III.   CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF System, which will automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF System, which includes the Defendant.  The said Notice of Electronic Filing specifically identifies recipients of electronic notice.

/s/ Nathen Barton
Nathen Barton